2025 IL App (3d) 240389

Opinion filed May 29, 2025

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| ENGLEWOOD CONSTRUCTION, INC., and SWALLOW CONSTRUCTION CORPORATION, | ) ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiffs | ) ) ) | |
| v. | ) ) | |
| J.P. McMAHON PROPERTIES, LLC; J.P. McMAHON PETRO-CHEMICAL TRANSPORT GROUP, LLC; K.L.F. ENTERPRISES, INC.; BUSEY BANK; and UNKNOWN OWNERS AND NON-RECORD CLAIMANTS, | ) ) ) ) ) ) ) | Appeal No. 3-24-0389 Circuit No. 21-CH-113 |
| Defendants | ) ) | |
| (Englewood Construction, Inc., Plaintiff and Counterdefendant-Appellant; J.P. McMahon Properties, LLC, and J.P. McMahon Petro-Chemical Transport Group, LLC, Defendants and Counterplaintiffs-Appellees). | ) ) ) ) ) ) ) | Honorable John C. Anderson, Judge, Presiding. |

PRESIDING JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justices Davenport and Bertani concurred in the judgment and opinion.

**OPINION**

¶ 1 Plaintiff and counterdefendant, Englewood Construction, LLC (Englewood), appeals from the trial court's partial grant of defendant and counterplaintiffs', J.P. McMahon Properties, LLC, (McMahon Properties) and J.P. McMahon Petro-Chemical Transport Group, LLC (McMahon Transport), (collectively, McMahon) first motion for summary judgment invalidating Englewood's mechanic's lien recorded against McMahon's property and partial grant of McMahon's section motion for summary judgment on its claim to quiet title and corresponding award of compensatory damages. Englewood also appeals the sanctions imposed against it. For the reasons set forth below, we reverse and remand.

¶ 2 **I. BACKGROUND**

¶ 3 This case arises from a mechanic's lien recorded by Englewood pursuant to the Mechanics Lien Act (Act) (770 ILCS 60/0.01 *et seq.* (West 2018)), against a Lockport property owned by McMahon Properties. McMahon Transport occupies the property and has common ownership with McMahon Properties. Busey Bank is the lender and mortgagee for the property. The record refers to James McMahon as both the principal and manager of the McMahon entities. William Di Santo is the president of Englewood.

¶ 4 The following facts are undisputed, and we recount only those which are relevant to the issues raised on appeal. Pursuant to an August 2019 written construction agreement (subsequently modified in July 2020), Englewood was employed as the general contractor for the construction of a building on McMahon's property. Between January 29, 2021, and February 5, 2021, and following a dispute between the parties, Englewood ceased work on the property. On February 5, 2021, Englewood sent McMahon a notice of default for nonpayment, and McMahon notified

Englewood of Englewood's own default for construction defects and demanded repairs thereof. The parties' written construction agreement was terminated.

¶ 5 On February 24, 2021, Englewood recorded an original contractor's claim for mechanic's lien against the property in the amount of $1,692,467.81 (original lien). At the time, Englewood was represented by Dean Farley of Much Shelist, P.C. McMahon was represented by Mark Lyman and Steve Varhola of Lyman Law Firm, LLC. A March 9, 2021, e-mail from Farley referenced a telephone conversation between Farley and Lyman wherein Lyman "mentioned that Mr. McMahon was paying subcontractors directly." Farley requested "proof of those payments, lien waivers, cancelled checks, etc.," stating that he could amend the amount of the lien once proof was tendered.

¶ 6 On March 15, 2021, at 8:45 a.m., Lyman e-mailed Farley what Lyman described as "[l]ien waivers and reimbursement letters evidencing direct payment by Owner to subcontractors for the sum of $1,505,874.83." Of the 25 lien waivers attached to the correspondence, only 2 named Englewood as the subcontractors' employer. The remaining 23 waivers named either J.P. McMahon, McMahon Properties, or McMahon Transport as the employer. Lyman further advised that additional subcontractor payments and lien waivers were forthcoming and demanded that Englewood immediately amend the original lien to reflect the payments evidenced in the lien waivers and prevent an improper cloud on the property's title. Also on March 15, 2021, at 9:37 a.m. (52 minutes later), Englewood recorded an original contractor's amended claim for mechanic's lien (first amended lien), which amended the contract dates but retained $1,692,467.81 as the lien amount claimed. The original and first amended lien claims were accompanied by an affidavit signed by Di Santo stating that "he has read the foregoing claim for lien and knows the contents thereof; and that all the statements therein contained are true."

¶ 7        Turning to the underlying litigation, on March 23, 2021, Englewood filed a three-count complaint against McMahon. In count I, Englewood sought foreclosure of its mechanic's lien, alleging that it fully completed all work under the written construction agreement but that, "after allowing proper credits and subject to Englewood's review of payments made by Owner directly to subcontractors," the principal sum of $1,692,467.81 remained due and owing from McMahon. Relying on the same facts, count II alleged breach of contract, and count III alleged unjust enrichment. Attached to the complaint was Di Santo's verification that the facts set forth therein were true and correct.

¶ 8        On April 13, 2021, McMahon filed a combined motion to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2020)). McMahon alleged that Englewood's lien contained a "substantial overcharge of $1,505,874.83" and that Englewood's conduct was constructively fraudulent, thereby invalidating the lien under section 7(a) of the Act (770 ILCS 60/7(a) (West 2018) (a lien can be defeated due to an error or overcharge only if is shown that the error or overcharge is made with intent to defraud)). McMahon cited the following as "additional evidence" of Englewood's fraudulent conduct: Di Santo's sworn attestations to the liens and his verification of the complaint, Englewood's failure to independently confirm McMahon's payments with the subcontractors, and Englewood's knowledge that the lien was preventing McMahon from receiving construction funding pursuant to McMahon's loan agreement with Busey Bank and being reimbursed for the subcontractor payments. McMahon further contended that Englewood failed to adequately state claims as to counts II (breach of contract) and III (unjust enrichment). Englewood was to respond to the motion to dismiss by May 5, 2021, and the hearing on the motion was scheduled for May 19, 2021.

¶ 9        On May 4, 2021, Englewood filed a motion seeking a nine-day extension to file its response to the motion to dismiss, explaining that it needed more time to investigate. McMahon opposed the motion, arguing that Englewood should have conducted its investigation prior to encumbering the property and that any extension would be prejudicial to McMahon. On May 13, 2021, and over McMahon's objections, the court granted Englewood's motion for extension and ordered its response to the motion to dismiss to be filed by May 14, 2021. The May 19, 2021, hearing date remained.

¶ 10       Englewood filed its response to the motion to dismiss on May 14, 2021, arguing, *inter alia*, that neither the original nor amended lien claims were intentionally overstated. Englewood claimed that the process of filing the amended lien had already started by the time Farley received the March 15, 2021, e-mail and lien waivers from Lyman. Englewood rejected McMahon's position that a lien can be found to be fraudulent based upon the timing of the filing of the complaint to foreclose the lien where, at the time of recording the lien claim, the amount claimed was not done so fraudulently. Englewood denied that McMahon's March 15, 2021, lien waivers were sufficient to relieve Englewood of liability under Englewood's contracts with its subcontractors, as "nearly every" waiver incorrectly stated that the subcontractors were employed by McMahon Properties rather than by Englewood. Englewood explained, *inter alia*, that it remained in privity with the subcontractors and that its "liability *** remains until the waivers are corrected, settlement releases with [McMahon] are executed, and the numbers alleged by [McMahon] are reconciled with Englewood pursuant to the subcontracts that Englewood remains bound to." In its reply, McMahon argued, *inter alia*, that Englewood's fraudulent intent arose after its receipt of the lien waivers when it failed to verify the amount of the lien or correct its overstatement before filing its

5

complaint. McMahon denied that the timing of the recording of the liens absolved Englewood of its intent to defraud.

¶ 11    At the hearing, McMahon elaborated that, due to Englewood's lien on the property, McMahon was unable to receive reimbursement for the subcontractor payments "because the bank obviously will not fund the title company unless the title company provides title insurance, and the title company won't do that because of the amount of the lien on the property." Following argument, the court took the matter under advisement. On May 26, 2021, the court entered an order denying the motion to dismiss because it "c[ould not] find, within the context of a motion to dismiss, whether [Englewood] acted fraudulently or with intent to defraud." The order provided that McMahon could make its argument again through affirmative defenses, a motion for summary judgment, or trial. Thereafter, McMahon filed its answer and affirmative defenses (invalid mechanic's lien and payment) to Englewood's complaint. A status hearing was scheduled for July 7, 2021.

¶ 12    On June 14, 2021, McMahon filed a three-count counterclaim against Englewood. Count I was a claim to quiet title based on Englewood having sufficient proof (lien waivers) of McMahon's subcontractor payments and, thus, no right to pursue the amount listed in the lien. Count II sought a declaratory judgment. Count III sought invalidation of the lien under section 7(a) of the Act. In connection with the invalidation of the lien, McMahon requested, *inter alia*, attorney fees under section 17(c) of the Act. *Id.* § 17(c) ("If the court specifically finds that a lien claimant has brought an action under this Act without just cause or right, the court may tax the claimant the reasonable attorney's fees of the owner ***.").

¶ 13    Farley failed to appear for the July 7, 2021, status hearing. Lyman appeared and informed the court of McMahon's filing of its answer, affirmative defenses, and counterclaim. A further status date was scheduled for August 12, 2021.

¶ 14    On July 19, 2021, McMahon filed a motion for default judgment, arguing that Englewood failed to answer its counterclaim by July 14, 2021. On August 3, 2021, the court entered an order denying the motion for default and gave Englewood until August 6, 2021, to file a responsive pleading. The order specified that "no further extensions shall be granted without a showing of good cause." A status hearing was scheduled for September 17, 2021.

¶ 15    Swallow Construction Corporation (Swallow) also recorded a mechanic's lien for $149,427.66 against the property and claimed that its last work at the property was in June 2021. Swallow filed an intervening three-count complaint against McMahon for foreclosure of its mechanic's lien, breach of contract, and *quantum meruit*. The substance of the litigation between McMahon and Swallow is not at issue in this appeal.

¶ 16    Englewood failed to timely respond to McMahon's counterclaim, and on August 13, 2021, McMahon filed a second motion for default judgment. On August 16, 2021, Englewood responded to the second motion for default judgment, explaining that Farley incorrectly diarized the due date for the response to McMahon's counterclaim. The same day, the court entered an order continuing McMahon's second motion for default judgment for hearing on August 17, 2021. In the interim, on August 16, 2021, Englewood filed its answer to McMahon's affirmative defenses and counterclaim. Englewood also asserted its own affirmative defenses of (1) failure to mitigate damages based upon McMahon's failure to produce proper documentation relieving Englewood of liability to the subcontractors and (2) estoppel based upon McMahon's seeking remedies that resulted from its own conduct. On August 20, 2021, the court denied McMahon's second motion

7

for default judgment and accepted Englewood's untimely answer to McMahon's counterclaim. The parties were ordered to issue written discovery by September 13, 2021, and answer discovery by October 4, 2021, and "[e]xtensions of time for discovery, or for any other purpose, w[ould] be disfavored and scrutinized." A status hearing was scheduled for October 13, 2021.

¶ 17    On September 16, 2021, McMahon filed a motion for summary judgment on all counts of its counterclaim against Englewood (MSJ 1). McMahon asserted that the lien waivers delivered to Englewood on March 15, 2021, were valid because, as evidenced by an attached February 5, 2021, letter from Englewood to Best Plumbing, Inc. (one of its subcontractors), Englewood terminated its subcontractor agreements on that date. The letter stated that the subcontract agreement between Englewood and Best Plumbing, Inc. was terminated and that McMahon Transport "ha[d] assumed direct responsibility for the balance of the work." Thereafter, McMahon rehired the subcontractors and was properly named as their employer in the lien waivers. Notwithstanding, McMahon attached amended lien waivers to MSJ 1 designating Englewood as the subcontractors' employer. Also attached to MSJ 1, and tendered to both the court and Englewood for the first time, were cancelled checks evidencing various payments made by McMahon to certain subcontractors, as well as covenants not to sue that were purportedly executed by the rehired subcontractors. McMahon reasserted its arguments related to Englewood's alleged constructive fraud.

¶ 18    Farley failed to appear for the September 17, 2021, status hearing. Lyman provided the court with the status of the case and requested to set a briefing schedule on MSJ 1, reminding the court that it was Farley's second missed court date. The order provided that, *inter alia*, Englewood was to respond to MSJ 1 by October 22, 2021, the hearing on MSJ 1 was scheduled for November 5, 2021, and "[c]ounsel for all parties must appear at all hearings by Zoom or such failure to appear will have negative consequences as further ordered by the Court."

¶ 19 Englewood did not timely file its response to MSJ 1. Instead, on November 4, 2021, at 7:26 p.m., the evening before the hearing on MSJ 1, Englewood filed a motion for leave to file its response to MSJ 1, claiming that Farley was ill and unable to work between October 21, 2021, and October 28, 2021, and that he did not have enough time to address the issues raised in MSJ 1 because of "other work load deadlines that became backed up as a result." Englewood's proposed 10-page response was attached as an exhibit.

¶ 20 In court the following day, McMahon objected to Englewood's filing. McMahon further informed the court that Englewood failed to adhere to the discovery deadlines previously set on August 20, 2021, and explained that it did not receive Englewood's motion for leave until 9:10 p.m. the evening before, causing counsel to needlessly prepare for the hearing. Farley never called Lyman to inform him of Farley's illness or inability to comply with the court order. McMahon questioned the credibility of Englewood's request and asked that McMahon's unopposed MSJ 1 be granted because it had "spent tens of thousands of dollars to prove that the subcontractors have been paid and that [Englewood] isn't on the hook."

¶ 21 Addressing Farley, the court inquired about his decision not to have another attorney at his firm prepare a response to MSJ 1 while he was sick, file a motion sooner than the day before the hearing, or call Lyman to inform him of his illness. The court said it "would be a little incredulous" if Farley's position was that he could not have done any of those things. Farley explained that he was trying to handle the case himself to "streamline things" but that he fell behind. The court was "perplexed" by Farley's ability to prepare the entire 10-page proposed response to MSJ 1 but was purportedly not well enough to give the court or Lyman advance notice that he wanted to continue the hearing and intended to respond to MSJ 1. Farley repeatedly apologized and took accountability for his error. The following discussion was had on the record:

9

"THE COURT: I mean, I'm really—I'm absolutely perplexed by this *** look, as I have said twice now, I have been in the situation where I was a young associate at a law firm, and there were days where it felt like the entire world was falling on me. I get it. I get that maybe there is a lot of work to do and you weren't feeling well, they probably put you behind the gun or behind the eight ball, and I don't want to do anything that's going to jeopardize somebody's livelihood or their job at a prestigious law firm, but at some point, I mean, what options do I have left?

MR FARLEY: Your Honor, at this point I can tell you that there will not be another deadline missed, and at that point I will not even argue anything."

Noting in the order that Englewood's motion for leave was not duly noticed, the court took the motion under advisement.

¶ 22    On November 9, 2021, Englewood recorded a second amended lien against the property, which provided that McMahon was entitled to a credit of $1,132,945.10 for direct payments to subcontractors. Englewood reduced its lien claim to $559,522.71.

¶ 23    On January 6, 2022, the court partially granted MSJ 1 and stated that, "[f]or the reasons set forth in the motion," Englewood's original, first amended, and second amended lien claims were invalidated pursuant to section 7(a) of the Act. Within two business days, Englewood was to provide a draft release of its lien to McMahon for approval and record the same within three days after receipt of written approval. Englewood was estopped from seeking any further relief under the Act with respect to any alleged outstanding amount owed by McMahon for work performed at the property. The remaining relief sought by McMahon in MSJ 1 was denied without prejudice.

¶ 24    On January 20, 2022, McMahon filed a petition for rule to show cause against Englewood, alleging that, in violation of the August 21, 2021, order, Englewood had failed to issue or respond

10

to written discovery requests. During the presentation of the motion on February 3, 2022, Englewood requested additional time to answer McMahon's discovery requests and issue its own discovery requests. McMahon objected, stating to the court, "You know what we've gone through with this. At some point in time playing catch-up has to stop." The court stated, "I mean, at some point—what do I have left that I can do to get this case moving, Mr. Farley?" Farley apologized and represented that he could issue Englewood's discovery requests that day but needed 28 days to respond to McMahon's requests. The court denied McMahon's petition for rule to show cause and granted the parties an additional 7 days to issue written discovery and 28 days thereafter to respond. The written order provided, *inter alia*, "[a]ny party that fails to respond to written discovery will be sanctioned by the Court barring exceptional circumstances demonstrated to the Court." The report of proceedings reveals that the court defined "exceptional circumstances" as "if someone is in the hospital, if someone had a baby, if somebody's house got hit by, you know, a tornado or something like that."

¶ 25    On March 25, 2022, McMahon advised the court during a status hearing that, while the parties timely exchanged written discovery requests, Englewood failed to respond to them. McMahon stated that, instead, on March 23, 2022 (13 days after the discovery responses were due and 2 days before the status hearing), Farley e-mailed Lyman a link to what Lyman characterized as a "document dump" of approximately 20,000 pages of documents without a corresponding written response to McMahon's interrogatories or requests to produce. Englewood denied producing a "document dump," explaining that McMahon requested Englewood's entire project file. Farley represented to the court that he did, in fact, include the written discovery responses in the e-mail with the 20,000 documents, and the court passed the case to allow counsel to "figure out what happened." They returned without reaching a resolution, and McMahon indicated that it

11

would be filing a motion for sanctions. The written order included, *inter alia*, leave for McMahon to file a motion related to the court's August 21, 2021, and February 3, 2022, orders and scheduled the hearing on the motion for sanctions for May 25, 2022.

¶ 26 On April 18, 2022, McMahon filed its motion for sanctions against Englewood and Farley. In addition to the alleged violations of court orders and dilatory conduct discussed (*supra* ¶¶ 19-21, 24-25), McMahon alleged that Farley misrepresented to the court that Englewood's written responses to McMahon's discovery requests were included in the "document dump." Farley e-mailed Englewood's answers to interrogatories to Lyman during the March 25, 2022, status hearing, but they were unverified. Also, as of the date of filing the motion for sanctions, Englewood still had not tendered its response to McMahon's request to produce. Moreover, McMahon had scheduled a deposition of Di Santo, which allegedly had to be cancelled because Englewood had not responded to discovery. Farley did not respond to Lyman's attempts to reschedule the deposition.

¶ 27 In support of its motion for sanctions, McMahon argued that Englewood had abused the legal process by not prosecuting its claims against McMahon, which it claimed were filed for an ulterior purpose. McMahon claimed that it had spent more time enforcing Englewood's compliance with court orders than Englewood had spent prosecuting its own claims and that the court had provided Englewood and Farley with "every opportunity to comply." McMahon opined that neither Englewood nor Farley feared sanctions and cited the court's "wide discretionary powers in matters of pretrial discovery" and its "inherent authority to control its docket." McMahon continued that the conduct put McMahon at an extreme disadvantage, caused it to incur unnecessary expenses, and prevented McMahon from defending Englewood's remaining claims and prosecuting its own counterclaim.

¶ 28    In response, Englewood argued, *inter alia*, that, while admittedly late in doing so, it meaningfully complied with discovery orders without prejudice to McMahon. Englewood denied filing its complaint for ulterior purposes, noting that it decreased its lien claim by $1,132,945.10 two months before being ordered to do so because McMahon finally tendered proof of payment, cancelled checks, releases, and proper waivers as part of MSJ 1. Englewood further denied intentionally causing a delay or purposely, willfully, or contumaciously disregarding the court.

¶ 29    On May 25, 2022, the court heard McMahon's motion for sanctions. Lyman explained to the court that, at 9:05 a.m., immediately before the hearing, Farley e-mailed Lyman Englewood's response to McMahon's request to produce and indicated that the corresponding "verification" should follow "soon." McMahon emphasized that Farley had historically used the court's motion call "as his calendar to respond to things." The court took the matter under advisement and stated, "[A] blown deadline on a discovery order, much to my irritation, happens all the time[,] *** [b]ut this particular case has blown deadlines that are on a scale and scope that are very unusual." The court again noted that it was "perplexe[d]" because it had previously given a "speech" to Farley for similar conduct.

¶ 30    On June 27, 2022, the court entered an order that recounted that the court noted at the hearing "its admonishments directed at Englewood and Farley concerning their habitual violations of this Court's Orders." The court found and ordered, in relevant part, as follows:

"1. McMahon's Motion for Sanctions is granted;

2. Counts II and III of Englewood's Complaint *** is dismissed with prejudice for its abuse of the legal process by improperly encumbering McMahon's real property which is evidenced, in part, by its failure to prosecute its claims against McMahon;

13

3. As a result of the admitted and willful violations and untimely compliance with this Court's Orders, including without limitation, Englewood's violation of the August 20, 2021 and February 3, 2022 Orders and its continued failure to comply, Englewood is barred from presenting:

a. any evidence at trial related to its damages claimed in the Complaint;

b. any evidence in defense of the claims or relief sought by McMahon in its Counterclaim; and

c. William Di Santo or any past or present employee of Englewood from testifying on Englewood's behalf at the trial of this matter.

4. McMahon is awarded attorneys' fees and costs incurred and related to its: (i) enforcement of this Court's Orders; (ii) preparation of discovery upon Englewood; (iii) preparation of its answers and responses to Englewood's written discovery; and (iv) preparation and prosecution of its Motion for Sanctions;

5. McMahon is granted leave to file a petition for attorneys' fees and costs consistent with this Order[.]"

A status hearing was scheduled for July 9, 2022.

¶ 31    On July 19, 2022, David Nightingale of Much Shelist, P.C., filed his appearance on Englewood's behalf. The same day, Englewood filed a motion to reconsider the court's June 27, 2022, order. Englewood stated that Farley was no longer employed by the firm and described his conduct as "an isolated occurrence in the firm's practice. The firm acknowledge[d] that prior counsel's responsiveness to the Court was not within the firm's expected level of professionalism for its attorneys and apologize[d] to the Court." Englewood confirmed that it had since provided

14

McMahon the necessary information to complete its discovery production and was prepared to proceed with its claims and McMahon's counterclaims.

¶ 32 In requesting that the court reconsider its sanctions order "in its entirety," Englewood argued that a default judgment or dismissal order as a discovery sanction is only appropriate when the sanctioned party's actions show a "deliberate, contumacious or unwarranted disregard of the court's authority" and should only be imposed as a last resort when less severe enforcement methods have not worked. See *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 123 (1998). Moreover, the purpose of sanctions is to "coerce compliance with discovery rules and orders, not to punish the dilatory party." *Id.* Here, Englewood continued, the sanctions ordered against it were the first discovery sanctions imposed and less coercive measures should have been put in place before reaching this stage.

¶ 33 On July 21, 2022, McMahon filed a petition for attorney fees, seeking those it claimed fell within the four categories outlined by the court in the June 27, 2022, order. In total, McMahon requested $28,268 in attorney fees and costs.

¶ 34 The same day, McMahon filed a motion for summary judgment (MSJ 2) on counts I (quiet title and compensatory damages) and III (invalidation of lien and sanctions pursuant to section 17(c) of the Act) of its counterclaim. Attached to MSJ 2 was an affidavit of James McMahon averring, in pertinent part, as follows:

> "4. On or about September 27, 2019, [McMahon] entered into a Construction Loan and Security Agreement with Busey Bank to finance the construction at [the property].
>
> 5. [McMahon] w[as] required to enter into permanent financing with Busey Bank upon completion of the construction.

15

6. In or about March 2021, the construction was sufficiently completed for [McMahon] to finalize its permanent financing with Busey Bank.

7. In March 2021, Busy [*sic*] Bank offered [McMahon] a fixed interest rate of 2.36% for the permanent financing.

8. In March 2021, Busey Bank would not enter into permanent financing with [McMahon] because of the mechanics lien recorded by Englewood against the Property prior thereto ('Lien').

9. On or about March 15, 2022, and after the Lien was released, [McMahon] entered into permanent financing with Busey Bank pursuant to a Term Note - Lockport with a 5 year term at a fixed interest rate of 3.00%.

10. As a result of having to pay a higher interest rate, [McMahon] [is] obligated to pay an additional $80,066.15 in interest during the 5 year term of the Term Note - Lockport.

11. Between March 2021 and March 2022, [McMahon] paid Busey Bank $3,050.00 for documentation, processing, and legal fees for extending the construction loan."

McMahon noted that, pursuant to the June 27, 2022, order, Englewood was "precluded from raising any genuine issue of fact." In support of its claim to quiet title, McMahon argued that, because the court previously invalidated Englewood's lien, it was an improper cloud on the property and McMahon was therefore entitled to compensatory damages in the amount of $83,116.15 (additional interest plus the costs incurred for extending the construction loan). In response to MSJ 2, Englewood argued, *inter alia*, that McMahon's action to quiet title was moot because the court previously ordered Englewood to remove its lien, which it did, and that compensatory damages were not available to McMahon in an equitable claim to quiet title.

16

¶ 35        On September 12, 2022, Englewood filed a motion to strike James McMahon's affidavit in support of MSJ 2. Citing Illinois Supreme Court Rule 191(a) (eff. Jan. 4, 2013) (setting forth the requirements for an affidavit in support of a motion for summary judgment), Englewood argued that the affidavit provided statements as to what someone at Busey Bank told someone at McMahon on unspecified dates, constituting impermissible hearsay. Englewood further contended that the affidavit failed to attach documents to support the conclusions of fact therein, thereby rendering James McMahon incompetent to testify to those facts.

¶ 36        On November 18, 2022, the court conducted a hearing on Englewood's motion to reconsider. Englewood argued, *inter alia*, that the court should not have gone "nuclear immediately" by "dismiss[ing] everything" as its first sanction against Englewood. The court clarified that "[t]he first sanction entered was an admonition. This was not the first sanction entered." The court further stated, "And the second warning or the second time was also an admonition, and I think the third as well." Englewood proceeded to draw a distinction between admonitions and sanctions and argued that the first sanction should have been a monetary sanction. The court took the motion under advisement.

¶ 37        On June 16, 2023, the court denied Englewood's motion to reconsider, explaining that it was "simply not true" that the court "pushed the proverbial nuclear button on Englewood's case without first considering less severe sanctions first." The court observed that it had several options when imposing sanctions, including " 'a warm friendly discussion on the record, a hard-nosed reprimand in open court, compulsory legal education, monetary sanctions, or other measures appropriate to the circumstances.' " *Heckinger v. Welsh*, 339 Ill. App. 3d 189, 192 (2003) (quoting *Thomas v. Capital Security Services, Inc.*, 836 F.2d 866, 878 (5th Cir. 1988)). The court continued,

17

"In this case, the litigants met numerous times in Court to discuss Mr. Farley's tardiness in complying with discovery orders, and in complying with court orders in general. Time and again, the Court rejected McMahon's requests for immediate and severe consequences. In progressive fashion, the Court began with friendly discussions on the record, then proceeded to hard-nosed reprimands and admonishments, and then even threats. These are all forms of lesser sanctions. The Court did everything it could to show empathy and patience, and yet nothing was done. And then the Court did not even make good on its threats and gave Englewood even more time. It had to end."

The court concluded that it went to "reasonable efforts to avoid the case being determined in this way" and denied Englewood's request for a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. March 8, 2016).

¶ 38    On June 30, 2023, McMahon filed a motion to set a hearing date on its petition for attorney fees and MSJ 2. In addition to the attorney fees set forth in its petition, McMahon sought an additional $23,492 in fees and costs that were incurred after its filing and attached invoices in support thereof.

¶ 39    On August 4, 2023, the court heard McMahon's petition for attorney fees and MSJ 2, as well as Englewood's motion to strike James McMahon's affidavit in support of MSJ 2. Beginning with the motion to strike, the court stated, "I do think [Englewood] makes a fair point as to Paragraph 8 [of the affidavit]. I think paragraph 7 is a little bit of a judgment call, but 8, I think, is improper." The court stated that it was "inclined to grant" the motion to strike but, instead, granted McMahon leave to supplement MSJ 2 with an affidavit from Busey Bank and allowed Englewood the opportunity to depose the affiant, although the court limited the deposition to "the averments in the supplemental affidavit." MSJ 2 was entered and continued, although the order provided that

18

there was to be no further briefing on it. Thereafter, the parties argued McMahon's petition for attorney fees, and the court stated, "I can't remember a case where I actually begged a lawyer to comply with court orders like I did with Mr. Farley multiple times." McMahon's petition for attorney fees was taken under advisement.

¶ 40    Thereafter, McMahon filed Steve Vilatte's supplemental affidavit in support of MSJ 2, which averred, in relevant part, as follows:

"1. At all relevant times and during the times referenced below, I was a Senior Vice President of Busey Bank ('Busey') and was primarily responsible for assisting [McMahon] in applying for and securing construction financing with Busey for [the property].

2. Busey approved and provided McMahon with construction financing and required after substantial completion of the construction at the [p]roperty that it convert the construction financing to a permanent loan at the then prevailing interest rate offered by or available from Busey.

3. Upon substantial completion of the construction at the [p]roperty, McMahon inquired about securing a permanent loan of the construction financing.

4. Busey received notice of [Englewood's lien] recorded against the property on March 15, 2021 ***.

5. In March 2021, I advised Jim McMahon with McMahon that Busey would not convert the construction financing to a permanent loan because of [Englewood's lien].

6. In April 2021, I advised Jim McMahon that the interest rate available for the permanent loan was 2.36% per annum.

7. Once [Englewood's lien] was released, Busey converted the construction financing to a permanent loan at a fixed interest rate of 3.00%."

19

No supporting documents were attached to the affidavit.

¶ 41        Englewood deposed Vilatte on October 12, 2023, and, in preparation thereof, on October 12, 2023, McMahon tendered documents to Englewood, including, but not limited to, (1) the construction loan and security agreement between McMahon and Busey Bank; (2) an e-mail from Vilatte to James McMahon dated March 8, 2021, stating, "Lien from the contractor"; (3) a February 24, 2021, letter from Farley to McMahon and Busey, *inter alios*, enclosing the original lien; (4) a September 14, 2021, letter from Vilatte to James McMahon stating, "Busey Bank is unable to fund any amount from your construction loan due to the Mechanic's Lien recorded against your property on March 15th, 2021, by Englewood Construction. Once the Mechanic[']s Lien is released or reduced[,] Busey Bank will be able to fund the amounts paid and released from your construction loan"; (5) term-note—Lockport dated March 15, 2022; (6) a July 8, 2022, letter from Vilatte to James McMahon stating that the interest rate he could have received in April 2021 was a fixed rate of 2.36% per annum, explaining that "[s]ince that point in time rates have dramatically increased which caused your fixed rate to be higher this year when we finally closed after the lien was released from your property"; and (7) invoices from Quarles & Brady LLP (Busey Bank's counsel who assisted with the loan extensions).

¶ 42        On November 9, 2023, Englewood filed a motion to strike Vilatte's affidavit in support of MSJ 2. Taking issue with paragraph two of the affidavit, Englewood argued that the loan documents between Busey Bank and McMahon were not attached to Vilatte's affidavit. Furthermore, Englewood observed that, despite Vilatte's averment that McMahon was required to convert its construction financing to a permanent loan upon "substantial completion of the construction," the loan documents contained no such requirement. When asked to locate this requirement in the loan documents, Vilatte did not know if it was in the document but stated that

"[c]ommon sense tells you when you have a completed project, you can flip it into a permanent." From this testimony, Englewood concluded that Vilatte was incompetent to testify as to the contents of paragraph two and that the affidavit should be stricken for failure to attach the loan documents upon which Vilatte relied. See *Selby v. O'Dea*, 2020 IL App (1st) 181951, ¶ 148 ("The personal-knowledge requirement forces affiants only to testify about facts within their personal knowledge, and if that knowledge was gleaned from an external source *** the affiant must say so. And if that source is written, that written document must be attached.").

¶ 43     Furthermore, citing Vilatte's response of "[n]ot at all" when asked whether he remembered when substantial completion of construction occurred and his testimony that it was "fair" to say that he did not recall exactly when James McMahon inquired about converting to a permanent loan, Englewood argued that there was no competent testimony as to when substantial completion occurred or when the inquiry regarding the permanent loan took place.

¶ 44     Arguing that paragraph five of the affidavit should be stricken, Englewood cited Vilatte's testimony that a contractor being on-site performing work would have prevented Busey Bank from closing on a permanent loan on the property. Englewood contended that, as of March 2021, Swallow was still performing work at the property (as evidenced by Swallow's recorded lien and intervening complaint stating that it did not complete its work until June 2021) and, therefore, McMahon would not have qualified for a permanent loan at this point irrespective of Englewood's lien. Thus, Englewood argued that Vilatte's averment that Englewood's lien prevented McMahon's securing of a permanent loan in March 2021 contradicted his testimony and rendered him incompetent to testify to these facts.

¶ 45     And finally, Englewood argued that paragraph six of the affidavit should be stricken. First, Englewood contended that the 2.36% interest rate was not available to McMahon in April 2021

21

because, considering Swallow's presence at the property, McMahon would not have qualified for a permanent loan at that time. Second, Englewood argued that Vilatte's knowledge as to the rate available to McMahon in April 2021 was based upon a document that was not attached to his affidavit. Vilatte testified that he calculated the 2.36% interest rate by referencing the London Interbank Offered Rate (LIBOR) online for March or April of 2021 and factoring in McMahon's basis points. Because McMahon did not attach the LIBOR documentation to Vilatte's affidavit, Englewood concluded that the affidavit must be stricken.

¶ 46    On November 15, 2023, Englewood filed a motion for leave to file a surresponse to MSJ 2 based upon the information gleaned from Vilatte's deposition, which was granted over McMahon's objection. Englewood's surresponse essentially restated the arguments set forth in its motion to strike Vilatte's affidavit and added that McMahon failed to mitigate its damages via title indemnity or mechanic's lien release bond pursuant to section 38.1 of the Act (770 ILCS 60/38.1 (West 2018)).

¶ 47    On March 8, 2024, the court heard McMahon's MSJ 2, McMahon's petition for attorney fees, and Englewood's motion to strike Vilatte's affidavit and took the matter under advisement. On May 9, 2024, the court entered an order setting forth its findings and ruling. Recalling in its initial summary of the case that it granted McMahon's prior motion for sanctions, the court stated, "Granting sanctions was something the Court struggled with because, in every case, the Court endeavors to adjudicate cases on their merits rather than on procedural or compliance deficiencies."

¶ 48    The court began with the issue of compensatory damages in connection with count I of McMahon's counterclaim (quiet title), as well as Englewood's motion to strike Vilatte's affidavit. The court awarded McMahon compensatory damages that arose from Englewood's "inflated"

22

mechanic's lien, noting that "[a]s a court of equity, this Court can do justice between the parties." McMahon's compensatory damages were set at $83,116.15 and reflected "the additional interest charge and the costs incurred with extending its construction loan until permanent financing could be secured."

¶ 49     The court denied Englewood's motion to strike Vilatte's affidavit, explaining,

"Englewood contends that Mr. [Vilatte] is not competent to testify because he lacks knowledge as to the terms in the construction contract between Englewood and McMahon. Englewood does not present any evidence that the construction contract dictates when Busey, a non-party, will provide permanent financing. This Court finds the evidence is clear that Busey elected to not provide permanent financing to McMahon in March 2021 at 2.36% because of the Mechanics Liens [recorded by Englewood]. This is evidenced not only by the affidavits, but by common sense: banks are less inclined to loan against property that is already encumbered."

Observing Englewood's failure to file a counteraffidavit, the court accepted the averments in James McMahon's and Vilatte's affidavits as true.

¶ 50     The court noted that it previously considered Englewood's affirmative defense of mitigation of damages in connection with MSJ 1 and found that it did not apply then or as applied to MSJ 2. "The record demonstrates that McMahon expended a tremendous amount of time, effort, and money to mitigate its damages, which resulted in the invalidation of the Mechanics Liens [filed by Englewood] and the striking of Englewood's Complaint and an award of attorneys' fees as sanctions."

¶ 51     Turning to McMahon's petition for attorney fees pursuant to the court's June 27, 2022, order, the court awarded McMahon attorney fees in the amount of $53,384.50. The court reviewed

23

the time sheets tendered by McMahon and found that the attorney fees were not duplicative and were reasonable based upon the skill and standing of the attorneys, the nature of the case, the time and labor involved and required, the usual and customary charge within the community, and the substantial benefits received by McMahon. The order stated that Englewood "shall pay the attorneys' award of $53,384.50 as a discovery sanction."

¶ 52     The court denied McMahon's claim for attorney fees pursuant under section 17(c) of the Act. The court reasoned, "Given that the Court is already awarding fees as a sanction (for admittedly other bases ***), the Court finds that an additional fee award would be too punitive to further the ends of justice. McMahon has exacted a pound of flesh for Englewood's conduct; the Court is not inclined to give it another pound in the form of more fees."

¶ 53     In a subsequent order, the court found that, "[p]ursuant to Rule 304(a), there is no just reason for delaying either enforcement or appeal or both" of the May 9, 2024, order. Englewood timely appealed.

¶ 54                                          II. ANALYSIS

¶ 55     On appeal, Englewood raises five central arguments. First, Englewood argues that the court erred in partially granting MSJ 1, thereby invalidating Englewood's lien as fraudulent under section 7(a) of the Act. Second, the court erred in partially granting MSJ 2 and awarding McMahon compensatory damages in connection with its claim to quiet title. Third, the court erred in denying Englewood's motion to strike Vilatte's affidavit in support of MSJ 2. Fourth, the court abused its discretion in imposing against Englewood the sanctions set forth in the June 27, 2022, order. Fifth, the court abused its discretion in awarding McMahon $53,384.50 in attorney fees as a discovery sanction against Englewood. For the reasons set forth below, we reverse and remand.

24

¶ 56    Prior to addressing the issues on appeal, we briefly address an argument raised in Englewood's reply brief. Englewood contends that McMahon's appellee brief is materially deficient under Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020) in that it fails to provide relevant dates throughout its statement of facts and argument, lacks sufficient citations to the record, and contains improper and derogatory statements about Englewood. We do not find any deficiencies in McMahon's brief so egregious to warrant striking any portion thereof but will disregard "any inappropriate or unsupported statements." See *John Crane Inc. v. Admiral Insurance Co.*, 391 Ill. App. 3d 693, 698 (2009). We therefore proceed to the merits of the appeal.

¶ 57                    A. MSJ 1: Invalidation of Englewood's Lien

¶ 58    The core issue raised on appeal is whether the trial court erred in partially granting McMahon's MSJ 1 and invalidating Englewood's lien under section 7(a) of the Act. 770 ILCS 60/7(a) (West 2018). Englewood argues that the validity of its lien should be measured by the date of recording its original lien claim, February 24, 2021. Because Englewood indisputably did not have *any* knowledge of the payments McMahon made to subcontractors as of that date, Englewood continues, it could not have acted with intent to defraud. Alternatively, Englewood argues that a genuine issue of material fact exists that precludes summary judgment, *i.e.*, what role, if any, the documents tendered by McMahon on March 15, 2021, or the documents tendered on September 16, 2021 (exhibits to MSJ 1), played in determining whether Englewood acted fraudulently. McMahon contends that the amended lien recorded on March 15, 2021, was invalid because McMahon had already provided Englewood *prima facie* evidence of McMahon's payments to subcontractors before its recording. McMahon states that Englewood "threw caution to the wind" and intentionally recorded the overstated amended lien without verifying the amount claimed.

25

¶ 59        Pursuant to section 2-1005(c) of the Code of Civil Procedure (735 ILCS 5/2-1005(c) (West 2020)), summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Our supreme court detailed the proper analysis as follows:

> "In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. A triable issue precluding summary judgment exists where the material facts are disputed or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts." *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 162-63 (2007).

Summary judgment should not be granted where the facts support more than one conclusion, including one unfavorable to the moving party. *Skipper Marine Electronics, Inc. v. United Parcel Service, Inc.*, 210 Ill. App. 3d 231, 236 (1991). In determining whether a genuine issue of material fact exists, a court must consider the entire record. *Spancrete of Illinois, Inc. v. Brickman*, 69 Ill. App. 3d 571, 576 (1979).

¶ 60        Summary judgment is a drastic remedy and should only be granted when the moving party's right to judgment is "clear and free from doubt." *Yakupcin v. Baker*, 83 Ill. App. 3d 624, 627 (1980). Notwithstanding, "summary judgment requires the responding party to come forward with the evidence that it has—it is the put up or shut up moment in a lawsuit." (Internal quotation marks omitted.) *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 14. We review rulings on summary judgment *de novo*. *Giannetti v. Angiuli*, 263 Ill. App. 3d 305, 306-07 (1994).

¶ 61 Section 7(a) of the Act provides, in relevant part, "No such lien shall be defeated to the proper amount thereof because of an error or overcharging on the part of any person claiming a lien therefor under this Act, *unless it shall be shown that such error or overcharge is made with intent to defraud ***.*" (Emphasis added.) 770 ILCS 60/7(a) (West 2018). "Section 7 is intended to protect an honest lien claimant who makes a mistake rather than a dishonest claimant who knowingly makes a false statement." *Peter J. Hartmann Co. v. Capitol Bank & Trust Co.*, 353 Ill. App. 3d 700, 706 (2004). A lien claim may be defeated based on constructive fraud where the claimant "knowingly files a lien containing a substantial overcharge" because such conduct "give[s] the appearance of a greater encumbrance on the property than that to which [the claimant] is entitled." *Lohmann Golf Designs, Inc. v. Keisler*, 260 Ill. App. 3d 886, 891 (1994). To prove constructive fraud, additional evidence beyond the overstatement or overcharge in the lien claim is required. *Father & Sons Home Improvement II, Inc. v. Stuart*, 2016 IL App (1st) 143666, ¶¶ 34-35 (additional evidence may be "an affidavit, signed by an agent of a contractor's company, which is attached to the mechanic's lien claim, and which falsely attests to the truth of overstatements and overcharges made by the contractor").

¶ 62 Initially, the parties disagree as to which date is relevant to the determination of Englewood's intent. Englewood argues that it is February 24, 2021—the date the original lien was recorded. McMahon's position on this point is somewhat inconsistent. For example, in its reply in support of its motion to dismiss, McMahon alleged, "*It is Englewood's filing of the Complaint* seeking monetary damages consistent with the Lien with the actual knowledge that the amount of the Lien and damages sought in the Complaint are grossly and falsely overstate *that constitutes its intent to defraud*." (Emphases added.) In its counterclaim, McMahon argued, "*Englewood's filing of the Complaint* seeking to foreclose a falsely overstated mechanics lien violated section 60/7(a)

27

of the Act." (Emphasis added.) In MSJ 1, McMahon alleged, "Before Englewood recorded its lien *and* filed its Complaint, [McMahon] provided it with *prima facie* evidence that $1,505,874.83 was no longer due and owing." (Emphasis added.) McMahon contended that the "false statements" in Di Santo's affidavit attached to the amended lien and his verification to Englewood's complaint constituted constructive fraud.

¶ 63    The lack of clarity in McMahon's pleadings renders it equally unclear which date the court relied upon in partially granting MSJ 1 and invalidating Englewood's lien, as the order explicitly relies upon "the reasons set forth in the Motion." On appeal, McMahon simultaneously argues that "[t]he date of recording the inflated Lien has no bearing on whether Englewood committed constructive fraud" and that Englewood recorded an inflated lien despite knowing McMahon had already paid the subcontractors. The confusion in this regard is problematic to the extent the proper date by which to measure Englewood's intent is potentially dispositive.

¶ 64    This issue presents a question of statutory construction, which we review *de novo*. *Standard Mutual Insurance Co. v. Rogers*, 381 Ill. App. 3d 196, 198 (2008). In interpreting a statute, we must "determine and give effect to the legislature's intent." *Id.* The plain language of the statute is the primary indicator of legislative intent, and, where the language of the statute is clear and unambiguous, we need not utilize other methods of statutory construction. *Id.*

¶ 65    Section 7(a) details, *inter alia*, what a lien claim must contain to be valid, which includes "the balance due after allowing all credits." The statute specifies that a lien should not be "defeated to the proper amount thereof because of an error or overcharging on the part of any person *claiming* a lien therefor under this Act, unless it shall be shown that such error or overcharge is made with intent to defraud." (Emphasis added.) 770 ILCS 60/7(a) (West 2018). Critically, section 7(a) references invalidating a lien based upon intent to defraud in relation to the intent of an individual

28

*claiming* a lien, not an individual *enforcing* a lien by filing an action (such as a complaint to foreclose a mechanic's lien). Indeed, section 17(c) of the Act separately provides consequences for a lien claimant who "*br[ings] an action* under this Act without just cause or right." (Emphasis added.) *Id.* § 17(c). Accordingly, we conclude that, in order to invalidate a lien pursuant to section 7(a) of the Act, the lien claimant must have acted with an intent to defraud at the time the lien claim was filed.

¶ 66    Caselaw supports this interpretation of section 7(a). In *Stuart*, the court explained that "[w]hen there is evidence *** that the lien claimant knowingly *filed a lien claim* containing false statements[,] the claim will be defeated." (Emphasis added.) *Stuart*, 2016 IL App (1st) 143666, ¶ 31. Similarly, in *Peter J. Hartmann Co.*, the court stated, "[w]here a lien claimant knowingly *files a lien* containing a substantial overcharge, the claim should be defeated on the basis of constructive fraud." (Emphasis added.) *Peter J. Hartmann Co.*, 353 Ill. App. 3d at 706.

¶ 67    Having established that a claimant's intent at the time of filing his or her lien claim is determinative, we next turn to Englewood's argument that we should only consider its intent at the time it filed its original lien on February 24, 2021. We disagree. Section 7(a) does not exclude from its reach an *amended* lien claim that contains an overcharge that is made with intent to defraud, nor can we read such an exception into the statute. *Maloney v. Janecyk*, 2025 IL App (1st) 250043, ¶ 13 ("Where the statutory language is clear and unambiguous, we will enforce it as written and will not read into it exceptions, conditions, or limitations that the legislature did not express."). Rather, an amended lien claim that contains an overcharge that is made with intent to defraud must have the same impact on a lien as a fraudulent original lien claim—the entire lien is invalid. To allow a fraudulent amended lien claim to stand merely because it was not the original would thwart the purpose of section 7. See *Peter J. Hartmann Co.*, 353 Ill. App. 3d at 706 ("Section

29

7 is intended to protect an honest lien claimant who makes a mistake rather than a dishonest claimant who knowingly makes a false statement.").

¶ 68    Thus, in order for summary judgment invalidating Englewood's lien claim to be proper, there must have been no genuine issue of material fact as to whether Englewood acted with intent to defraud at the time either its original lien or amended lien claims were filed. Based upon the arguments presented on appeal, we address only whether Englewood's first amended lien was properly determined to be fraudulent at the summary judgment stage.

¶ 69    On appeal, Englewood reasserts its argument that the lien waivers tendered by McMahon on March 15, 2021, were invalid because they improperly designated McMahon, instead of Englewood, as the subcontractors' employees. Moreover, McMahon did not provide corrected lien waivers or canceled checks evidencing its subcontractor payments until it filed MSJ 1 on September 16, 2021. Thereafter, on November 9, 2021, Englewood recorded a partial reduction of the lien. Englewood argues that these facts establish a genuine issue of material fact—which set of documents should be relied upon in determining its intent. McMahon, on the other hand, argues that Englewood, prior to recording its amended lien, should have confirmed McMahon's payments with the subcontractors once Englewood received the lien waivers on March 15, 2021, instead of "st[i]ck[ing] its head in the sand." McMahon contends that, in conjunction with the overstated lien, Englewood's receipt of *prima facie* evidence McMahon's payments and Di Santo's false sworn statements that Englewood was owed $1,692,467.81 serve as "additional evidence" from which the court properly found Englewood's constructive fraud and invalidated its lien. McMahon further denies that its March 15, 2021, lien waivers were invalid.

¶ 70    Questions of fraudulent intent are not generally decided at the summary judgment stage given that they typically turn on credibility determinations. See *Palmateer v. International*

*Harvester Co.*, 140 Ill. App. 3d 857, 860 (1986) ("[I]ntent is a question of material fact, not normally subject to summary judgment."). To do so requires unrefuted evidence of fraud. *Independent Trust Corp. v. Hurwick*, 351 Ill. App. 3d 941, 955 (2004). When reviewing the facts in the light most favorable to Englewood, it is apparent that questions of material fact remain, including Englewood's knowledge and intent when filing its first amended lien. For illustrative purposes only, we explore some of these questions below without expressing any opinion as to how the court should assess Englewood's credibility on any of these issues.

¶ 71    We begin with McMahon's suggestion that Englewood's fraudulent intent is revealed by its failure to independently confirm with the subcontractors whether McMahon had paid them directly. McMahon does not cite any authority that would impose this duty on Englewood. The parties' agreement reveals that it was contemplated that McMahon would pay Englewood, and not the subcontractors, directly. And the parties do not dispute that the amount claimed in the lien represented work that was performed at the property while Englewood was the general contractor. As such, Englewood was not required to contact each subcontractor to determine whether McMahon made alternative payment arrangements. We observe parenthetically that securing priority for a lien claim is a time-sensitive task and, as McMahon has set forth, obtaining lien waivers to release Englewood from liability to the subcontractors was a time consuming and costly endeavor. Thus, we reject McMahon's argument that Englewood's conduct in this regard rose to the level of evidence necessary to find fraudulent intent at the summary judgment stage.

¶ 72    Furthermore, Lyman's March 15, 2021, e-mail attaching the lien waivers was sent to Farley exactly 52 minutes before Englewood's first amended lien was recorded. In its response to McMahon's motion to dismiss, Englewood claimed that the process of filing the first amended lien had already commenced by the time Farley received the e-mail. Therefore, it remains at issue

31

whether Englewood even had notice of the March 15, 2021, lien waivers and other documentation prior to recording the first amended lien.

¶ 73    We need not determine whether the March 15, 2021, lien waivers were legally valid, as this is not a case seeking their enforcement. Even if Englewood did review the lien waivers and other documentation tendered on March 15, 2021, prior to recording its first amended lien, it remains to be seen what impact this information had on Englewood's intent. Englewood continues to assert that it believed that the lien waivers were insufficient to release it from liability to the subcontractors. Assuming, *arguendo*, that the lien waivers were valid, a material fact remains whether Englewood made a *mistake* in recording its first amended lien, rather than knowingly or fraudulently filing a false statement. The former conclusion would place Englewood within the protections of section 7. See *Peter J. Hartmann Co.*, 353 Ill. App. 3d at 706. This issue is ultimately a credibility determination improper for summary judgment.

¶ 74    The cases cited by McMahon to the contrary are unpersuasive. In *Stuart*, the court affirmed summary judgment invalidating a construction company's lien based upon section 7(a) of the Act where (1) the construction company admitted that the date the work was completed was different than the date stated in the lien, (2) the parties' contract unambiguously revealed that the lien amount claimed was not due until nearly two months after the date listed in the lien, and (3) the construction company's president falsely attested to the truth of the overstatements and overcharges in the lien claim. *Stuart*, 2016 IL App (1st) 143666, ¶¶ 37-39. The court also noted that the construction company made "patently false statements" to establish its right to a mechanic's lien. *Id.* ¶ 36. In *Lohmann*, the court held that a contractor engaged in constructive fraud when it filed separate lien claims on three properties, claiming the aggregate value of all three properties in each lien claim. *Lohmann*, 260 Ill. App. 3d at 891-92. This effectively tripled

the amount of the contractor's lien claim. *Id.* The president of the construction company attested to the amount claimed, despite it being "reasonable to infer" that, as president, he knew that only one-third of that amount was actually due and owing. *Id.* at 892. Even more, the contractor did not correct its lien claim, despite being on notice for at least seven months. *Id.* at 893. Here, McMahon has not presented similarly compelling evidence to render summary judgment appropriate at this juncture.

¶ 75    We further reject McMahon's contention that Englewood's failure to file a counteraffidavit in response to MSJ 1, which was supported by James McMahon's affidavit, was fatal. While a nonmoving party's failure to file a counteraffidavit in opposition to a motion for summary judgment results in the averments contained in an affidavit in support of said motion to be taken as true notwithstanding contrary assertions in the nonmovant's pleadings, "the moving party should not be awarded summary judgment unless the affidavits filed in support of the motion establish the judgment as a matter of law." *Spancrete*, 69 Ill. App. 3d at 576. Here, James McMahon's affidavit in support of MSJ 1 neither avers to nor establishes Englewood's fraudulent intent, nor could it since such information is not within James McMahon's personal knowledge. Therefore, James McMahon's affidavit, even when accepted as true, fails to independently support MSJ 1.

¶ 76    Simply put, the evidence that has been presented regarding Englewood's intent up to this point is not of such caliber as to render a trial unnecessary. As discussed *infra*, the sanctions imposed upon Englewood barring any evidence in defense of McMahon's claims were improper and, therefore, Englewood is permitted to offer evidence of its intent at trial. Therefore, the court's invalidation of Englewood's lien and partial grant of MSJ 1 were improper.

¶ 77    We reverse the January 6, 2022, order accordingly and remand for further proceedings.

¶ 78                B. MSJ 2: Quiet Title, Compensatory Damages, and Vilatte's Affidavit

¶ 79        We now turn to the court's grant of MSJ 2 on McMahon's claim to quiet title and compensatory damages in the amount of $83,116.15. Englewood argues that, because a genuine issue of material fact remains as to the validity of its lien, it cannot be an unfounded cloud on McMahon's title to the property for purposes of summary judgment. Englewood also reasserts its argument below that Vilatte's affidavit in support of MSJ 2, which was offered to support McMahon's damages claim, should have been stricken. Finally, Englewood argues that an action to quiet title is an equitable action and, therefore, compensatory damages are improper. McMahon counters that, because the amended lien was overstated, it would be inequitable to enforce. McMahon argues that a court of equity "can award damages as an adjunct to its equity jurisdiction."

¶ 80        Given our determination that the validity of Englewood's lien was not properly determined by summary judgment, neither was McMahon's claim to quiet title. See *Illinois District of American Turners, Inc. v. Rieger*, 329 Ill. App. 3d 1063, 1072 (2002) ("A valid interest in property cannot be a cloud on title."). Stated otherwise, if it is ultimately determined that Englewood's mechanic's lien was valid, it cannot be an improper cloud on title to the property, and McMahon's quiet title claim would fail. For this reason, the grant of summary judgment on McMahon's quiet title claim was improper and we need not reach the sufficiency of the Vilatte affidavit in support thereof or the propriety of the resulting compensatory damages.

¶ 81        Therefore, we reverse the trial court's partial grant of MSJ 2 on McMahon's quiet title claim and remand for further proceedings.

¶ 82                       C. Sanctions and Attorney Fees

¶ 83        Englewood next challenges the sanctions imposed against it in the June 27, 2022, order dismissing its complaint with prejudice "for its abuse of the legal process *by improperly encumbering McMahon's real property* which is evidenced, in part, by its failure to prosecute its claims against McMahon." (Emphasis added.) The order also barred Englewood's presentation of (1) evidence related to damages claimed in its complaint, (2) evidence in defense of McMahon's counterclaim, and (3) testimony of Di Santo or any other past or present Englewood employee. Englewood argues that the sanctions were punitive and failed to demonstrate a progressive application of sanctions. McMahon contends that the sanctions imposed were appropriate given Englewood's dilatory conduct and were within the court's discretion.

¶ 84        Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) states that, if a party unreasonably fails to comply with discovery rules or an order entered pursuant to the rules, the court may enter just orders, including but not limited to the following:

> "(i) That further proceedings be stayed until the order or rule is complied with;
>
> (ii) That the offending party be debarred from filing any other pleading relating to any issue to which the refusal or failure relates;
>
> (iii) That the offending party be debarred from maintaining any particular claim, counterclaim, *** or defense relating to that issue;
>
> (iv) That a witness be barred from testifying concerning that issue;
>
> (v) That, as to claims or defenses asserted in any pleading to which that issue is material, a judgment by default be entered against the offending party or that the offending party's action be dismissed with or without prejudice;
>
> (vi) That any portion of the offending party's pleadings relating to that issue be stricken and, if thereby made appropriate, judgment be entered as to that issue[.]"

35

¶ 85 "To allow a party to defy a discovery order without facing sanctions can be likened to a dog without teeth—all bark and no bite. A pattern of dilatoriness should not be tolerated, as it hurts the opposing party and is a burden on the court system." *Locasto v. City of Chicago*, 2014 IL App (1st) 113576, ¶ 37. A trial court has broad discretion in fashioning an appropriate sanction under Rule 219. *Id.* ¶ 26. A sanction will not be reversed absent an abuse of discretion, " 'such as where the sanctioned party's conduct was not unreasonable or where the sanction itself is not just.' " *Koppel v. Michael*, 374 Ill. App. 3d 998, 1004 (2007) (quoting *Hartnett v. Stack*, 241 Ill. App. 3d 157, 172 (1993)). Notwithstanding, discovery sanctions "should be tailored to promote discovery, not punish a dilatory party," and "customized to address the nature and extent of the harm while prescribing a cure to the specific offense." *Locasto*, 2014 IL App (1st) 113576, ¶ 27.

¶ 86 We begin with a discussion of the court's dismissal of Englewood's complaint with prejudice. While we initially observe that it is not entirely clear whether, by imposing this sanction, the court invoked its inherent authority to control its docket (*Sander v. Dow Chemical Co.*, 166 Ill. 2d 48, 65-66 (1995)) or fashioned a discovery sanction under Rule 219(c), the sanction cannot stand under either standard. The propriety of a sanction is fact-specific, and we cannot "affirm the imposition of a sanction for any behavior other than that relied upon by the trial court." *Smith v. City of Chicago*, 299 Ill. App. 3d 1048, 1052 (1998).

¶ 87 Here, the court's decision to dismiss Englewood's complaint with prejudice was explicitly predicated upon Englewood's "abuse of the legal process *by improperly encumbering McMahon's real property*, which is evidenced, in part, by its failure to prosecute its claims against McMahon." (Emphasis added.) However, as discussed (*supra* ¶¶ 70-76), whether Englewood improperly encumbered the property was not a question that could be appropriately determined at the summary

36

judgment stage, and therefore a sanction specifically imposed based upon this premature conclusion must be reversed as being an abuse of the court's discretion.

¶ 88    We next address the sanctions imposed "[a]s a result of the admitted and willful violations and untimely compliance with this Court's Orders, including without limitation, Englewood's violation of the August 20, 2021 and February 3, 2022 Orders and its continued failure to comply." For these violations, the court barred Englewood from presenting any evidence related to the damages claimed in its complaint, evidence in defense of McMahon's counterclaim, and testimony of Di Santo or any other past or present Englewood employee. We note that these sanctions resulted in *de facto* default judgments in McMahon's favor.

¶ 89    "[C]ourts should be reluctant to grant the extreme sanction of barring evidence when that ruling effectively resolves the case against the proponent of the evidence." *Shelbyville Mutual Insurance Co. v. Sunbeam Leisure Products Co.*, 262 Ill. App. 3d 636, 643 (1994). Default judgment is a "drastic sanction[ ]" and should only be utilized "when it appears that all other enforcement efforts of the court have failed to advance the litigation." *Sander*, 166 Ill. 2d at 67-68. A default judgment is justified where the noncomplying party has showed a " 'deliberate and contumacious disregard for the court's authority.' " *Koppel*, 374 Ill. App. 3d at 1007 (quoting *Sander*, 166 Ill. 2d at 68). Progressively harsh discovery sanctions should be employed to gain compliance with discovery rules and orders. See *Locasto*, 2014 IL App (1st) 113576, ¶ 27; *Koppel*, 374 Ill. App. 3d at 1000-01. Default judgment has been reversed where the court did not consider intermediate sanctions or issue an advance warning that continued noncompliance could result in default. *Locasto*, 2014 IL App (1st) 113576, ¶ 46. When considering sanctions pursuant to Rule 219, a court may only consider conduct that occurred during the discovery process. *Id.* ¶¶ 33-34, 38.

¶ 90	The following scenario has been described as "[a] proper application of progressive discovery sanctions":

"In *Koppel*, two months after filing their amended complaint, plaintiffs moved for discovery sanctions on the grounds that defendants had failed to respond to plaintiffs' request for production of documents, as well as answer plaintiffs' first set of interrogatories. [Citation.] In response, the trial court gave defendants one month to answer the interrogatories and produce the requested documents. [Citation.] When defendants failed to comply with that order or appear in court, the trial court ordered defendants to pay plaintiffs' attorney fees for the appearance as a sanction. [Citation.] The court also advised [defendants] that the nature of the sanctions imposed will become more severe as their non-compliance persists. [Citation.] A month later, after plaintiffs filed a renewed motion for default judgment for defendants' continuing refusal to comply with the court's discovery orders, the trial court ordered defendants to pay $500 in connection with its previous order as well as the fees plaintiffs incurred in preparing the renewed motion and appearing in court. [Citation.] The court also again informed defendants sanctions will increase with [your] continuing non-compliance with the court's orders. [Citation.] A month later, again, the trial court reminded defendants sanctions [will] increase until compliance. [Citation.] At the next status hearing, after finding that defendants had failed to comply with plaintiffs' discovery requests, the trial court ordered defendants to pay plaintiffs the monetary sanctions. The court also held by virtue of defendants' continuing non-compliance with discovery, defendants are barred from calling any witnesses at trial. [Citation.] The court informed defendants that the bar would be vacated if there was compliance. [Citation.] Three months later, the trial court entered default judgment in plaintiffs' favor as a sanction

38

for defendants continuing noncompliance with this court's discovery orders. [Citation.] Defendants moved to vacate the default judgment, but when neither the defendants nor their attorney appeared at the hearing, the court denied the motion and awarded damages to plaintiffs. [Citation.]" (Internal quotation marks omitted.) *Id.* ¶ 43. These sanctions were affirmed on appeal, with the court explaining that they properly increased in severity and that defendants had "shown that no sanction would encourage them to satisfy their obligations and respect the Court's authority." (Internal quotation marks omitted.) *Koppel*, 374 Ill. App. 3d at 1005, 1007.

¶ 91 Here, we recount Englewood's conduct with respect to the discovery process only, as it is the only behavior the court was permitted to consider in sanctioning Englewood under Rule 219(c). The court set the initial written discovery deadline on August 20, 2021, requiring the parties to answer by October 4, 2021. The order stated that discovery extensions would be "disfavored and scrutinized." On January 20, 2022, McMahon filed a petition for rule to show cause alleging that Englewood had not issued or responded to discovery requests. On February 3, 2022, and subsequent to Englewood's failure to adhere to multiple deadlines that were both related and unrelated to discovery, the court asked Farley what the court had left that it could do to get the case moving. Notwithstanding the August 20, 2021, warning that discovery extensions would be "disfavored and scrutinized," the court denied the petition for rule to show cause and granted the parties an additional 7 days to issue written discovery requests and 28 days thereafter to respond (by March 10, 2022). On March 23, 2022, Farley e-mailed a link to Lyman with more than 20,000 documents, apparently without a corresponding written response to McMahon's interrogatories or request to produce. Noting that Englewood did not have a motion for extension on file, the court again inquired as to where that left the court. Farley allegedly misrepresented to the court that the

written responses were, in fact, tendered simultaneously with the documents. Farley e-mailed Lyman unverified responses to interrogatories during court that day. McMahon filed its motion for sanctions pursuant to Rule 219 and detailed Englewood's dilatory conduct that was both discovery and nondiscovery related. McMahon cancelled Di Santo's deposition because it had not received Englewood's discovery responses, and Farley did not respond to attempts to reschedule. On May 25, 2022, immediately before the hearing on McMahon's motion for sanctions, Farley e-mailed Lyman a written response to the request to produce, but it did not contain an affidavit of completeness. During the hearing, Farley admitted that he, and not Englewood, was to blame for the delay. The court recalled that it had already "given a speech" to Farley on more than one occasion about similar conduct, noting that it was "perplexe[d]." The June 27, 2022, sanctions order followed.

¶ 92    The procedural trajectory detailed above demonstrates that the sanctions imposed were not progressive in fashion, let alone that they were a result of all other enforcement methods having failed. The court fairly warned the parties on August 20, 2021, that extensions for discovery would be "disfavored and scrutinized" and, again on February 3, 2022, that a party failing to respond to discovery would be sanctioned. However, while the court undeniably showed empathy for Farley's position working in a busy law firm, the court's lack of follow through on its warnings of sanctions and its continued extensions without meaningful consequences rendered it "all bark and no bite," as it fostered an environment that tolerated defiance of discovery orders. See *Locasto*, 2014 IL App (1st) 113576, ¶ 37. "Indeed, unless and until trial judges clamp down on discovery abuses[,] *** little incentive exists for the already recalcitrant party to comply." *Id.* ¶ 25. The court acknowledged as such in its June 16, 2023, denial of Englewood's motion to reconsider the sanctions when it noted that it "did not make good on its threats" and continued granting

40

Englewood extensions. When it became apparent that "speech[es]" and warnings of sanctions were not effective in obtaining Englewood or Farley's compliance, the court should have more gradually escalated the sanctions (such as issuing a monetary sanction) to determine whether "all other enforcement methods" truly would have failed to advance the litigation, thereby rendering a *de facto* default judgment appropriate. Englewood did not realize any meaningful consequences for its dilatory behavior, irrespective of who was to blame, until its complaint was dismissed with prejudice and a *de facto* default judgment was entered. For these reasons, we conclude that the court abused its discretion and reverse the June 27, 2022, order accordingly.

¶ 93    And finally, we address the propriety of the court's award of $53,384.50 in attorney fees to McMahon. Englewood argues that, based upon the four categories of attorney fees that were made available to McMahon as part of the June 27, 2022, order, the award exceeded the relief provided by Rule 219(c) because it included fees for tasks unrelated to discovery violations. McMahon counters that "Englewood's conduct transcended the relief provided for under Rule 219(c) requiring the Trial Court to control its docket. And a trial court may impose additional sanctions based on its inherent authority to control its docket."

¶ 94    Prior to turning to the merits of this issue, we must determine under which authority the court awarded McMahon attorney fees. While we agree with McMahon that, as a general rule, the court has the inherent authority to impose sanctions to control its docket (*Sander*, 166 Ill. 2d at 65-66), it is apparent from the language of the May 9, 2024, order that the court did not award attorney fees under the umbrella of its inherent authority. Rather, the order explicitly provides that Englewood "shall pay the attorneys' award of $53,384.50 *as a discovery sanction*." (Emphasis added.) Thus, we must determine whether the award was a proper discovery sanction under Rule 219(c).

41

¶ 95    Rule 219(c) states, in relevant part, as follows:

"In lieu of or in addition to the foregoing, the court, upon motion or upon its own initiative, may impose upon the offending party or his or her attorney, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of reasonable expenses *incurred as a result of the misconduct*, including a reasonable attorney fee, and when the misconduct is wilful, a monetary penalty." (Emphasis added.) Ill. S. Ct. R. 219(c) (eff. July 1, 2002).

Accordingly, "Rule 219(c) clearly requires that a sanction of expenses, including attorney fees, must be related to and be the result of the specific conduct involved in the discovery violation." *Hartnett*, 241 Ill. App. 3d at 175.

¶ 96    The June 27, 2022, and May 9, 2024, orders fail to identify how the attorney fees incurred in connection with McMahon's efforts to enforce Englewood's compliance with court orders that were unrelated to discovery, preparation of discovery upon Englewood, or preparation of responses to Englewood's discovery requests were incurred as a result of Englewood's discovery violations. Indeed, in order to maintain its own compliance with the court's discovery orders and rules, McMahon was required to propound discovery upon Englewood and respond to Englewood's discovery requests. Thus, Englewood cannot be charged with the attorney fees McMahon incurred by completing tasks that were ordered by the court and not as a result of Englewood's misconduct.

¶ 97    Therefore, we reverse the award of attorney fees and remand for a recalculation of those that were incurred as a result of Englewood and Farley's discovery related misconduct, including but not limited to those incurred in connection with McMahon's preparation and prosecution of its motion for sanctions. If Englewood's or Farley's discovery related misconduct is found to have

been willful, the court may also consider a monetary penalty as a sanction. Finally, because the court's denial of McMahon's attorney fees and costs pursuant to section 17(c) of the Act was based upon its improper calculation of attorney fees under Rule 219(c), the court may revisit the issue of whether attorney fees under section 17(c) are warranted.

¶ 98                                    III. CONCLUSION

¶ 99        The judgment of the circuit court of Will County is reversed and remanded.

¶ 100       Reversed and remanded.

*Englewood Construction, Inc. v. J.P. McMahon Properties, LLC*, 2025 **IL App (3d) 240389**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 21-CH-113; the Hon. John C. Anderson, Judge, presiding. |
| **Attorneys for Appellant:** | Scott R. Fradin and David F. Nightingale, of Much Shelist, P.C., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Steve M. Varhola and Mark M. Lyman, of Lyman Law Firm, LLC, of Chicago, for appellees. |